IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAYMOND BLEILER | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 14-2308 |
| DOYLESTOWN HOSPITAL | : | |

### MEMORANDUM

**SURRICK, J.**                                                                                                         **AUGUST   28th   , 2015**

Presently before the Court is Defendant Doylestown Hospital's Motion for Summary Judgment. (ECF No. 18.) For the following reasons, the Motion will be granted.

**I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Raymond Bleiler was hired by Defendant Doylestown Hospital in January 2007 as a Data Center Analyst ("DC Analyst") in the Management Information Systems Department ("MIS"). (Pl. Dep. 73-74, Mot. for Summ. J. Ex. 1.)[1] The primary duties for that position included monitoring the Hospital's computer systems and servers, reporting any errors or abnormalities when they occurred so they could be resolved, and documenting that monitoring and reporting. (Mot. for Summ. J. Ex. 2 at DH00070; Pl. Dep. 75-76.) Bleiler worked a forty-hour week, Monday through Friday, and was "on-call" at least every seventh day. (Pl. Dep. 80.)

The on-call shifts were rotated between the MIS department employees. The employee on call would receive a page regarding a computer or server issue, and he was required to document the problem and resolve it, if possible. (*Id.* at 84-85.) If the employee could not

---

[1] In evaluating a motion for summary judgment, we view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 355 (1986).

resolve the problem himself, he was required to escalate the issue to a network analyst, an applications analyst, or a manager.  (*Id.*)  On-call employees were required to respond quickly when contacted.  (*Id.* at 89.)

On-call employees provided an alternative method of contact in addition to the pagers that were assigned to them.  Bleiler initially gave his home phone number as his alternative form of contact.  (*Id.* at 91-92.)  At some point he provided his cell phone number instead, but in January 2013, he directed that his cell phone number be removed from the operators' list and replaced with his home phone number.  (*Id.* at 94-95.)

From January 2007 to April 2011, Bleiler's direct supervisor was Robin Hall, the Director of Information Technology.  (*Id.* at 74.)  In May 2011, Fred Sparks became the Network Services Manager and direct supervisor to the DC Analysts, including Bleiler.  (*Id.* at 196-97; Sparks Dep. 9-11, Mot. for Summ. J. Ex. 3.)  Sparks reported to Hall.  (Hall Dep. 10, Mot. for Summ. J. Ex. 4.)

On or about April 12, 2011, Bleiler was working in the Hospital's data center.  The data center is a room with racks of computer servers arranged in rows with aisles in between, like stacks of books in a library.  (Pl. Dep. 96-98.)  The aisles are between three and four feet wide.  (*Id.* at 162.)  Bleiler was standing in one of the aisles, facing the servers and monitoring a system, when Hall came down the aisle and whispered that she needed to squeeze by him.  (*Id.* at 98-99.)  When she squeezed by, Bleiler felt her breasts press against his back.  (*Id.* at 100-101.)

Bleiler was offended by the contact.  He complained about the incident to Barb Hebel, the Hospital's Vice-President of Human Resources.  (*Id.* at 165.)  Hebel tasked Neil Rosner, the Hospital's Associate Relations and Development Coordinator, with investigating Bleiler's complaint.  (*Id.* at 171-72.)  Rosner met with Bleiler, and Bleiler described what occurred in the

data center.  He also described two other times that he felt Hall had touched him inappropriately.[2]  Bleiler suggested that Rosner speak to several other employees in furtherance of the investigation.  (Rosner Dep. 28-31, Mot. for Summ. J. Ex. 7.)  Rosner spoke to those employees directly.  (*Id.*)  He did not speak to Hall or Sparks about either the incident or the investigation.  (Hall Dep. 11; Rosner Dep. 26, 99; Sparks Dep. 28-29.)

Sometime in early May 2011, Bleiler returned to work after undergoing a medical procedure, at which point Sparks informed him that his time clock punches were going to be closely monitored and that the Hospital's sick policy would be strictly enforced.  (Pl. Dep. 210-214.)[3]  A week or so later, Rosner met with Bleiler and informed him that the investigation had not uncovered any evidence of Hall making inappropriate physical contact with an employee.  Rosner said that he would not pursue Bleiler's complaint any further.  (*Id.* at 189; Rosner Dep. 81.)  Bleiler asked to be transferred out of the department, but Rosner denied that request.  (Pl. Dep. 190-92.)

In November 2011, Bleiler received his annual performance review.  (Mot. for Summ. J. Ex. 11.)  His overall score was 56, out of a possible 100.  (*Id.* at P35.)  Even though this score was not unlike the ones he had received in the past,[4] Bleiler believed that the review was unfairly negative.  Specifically, Bleiler protested references in his review to "things not being monitored [and] logs not being properly signed off"; he protested a comment that he was not a "team

---

[2] Bleiler reported that on two prior occasions, Hall walked up behind him while he was seated, and without saying anything, dragged her hand against his chest and walked away.  (Pl. Dep. 113-116, 127-28.)

[3] The Hospital's sick occurrence policy permitted three sick occurrences in any 12-month period.  (Pl. Dep. 210, 214.)

[4] Bleiler received an overall score of 62 in his 2010 annual performance review, and a score of 58 in his 2009 review.  (Hall Decl. Exs. G & H, Mot. for Summ. J. Ex. 5.)

player"; and he believed that he should have been accorded an "exceeds expectations" rating in one particular category. (Pl. Dep. 270-71; Mot. for Summ. J. Ex. 12 at 23-25.)

On December 6, 2011, Bleiler met with Rosner and expressed his belief that the review was inaccurate. (Pl. Dep. III 22, Mot. for Summ. J. Ex. 14.) A follow-up meeting between Rosner, Sparks, and Bleiler was scheduled for February. Although Bleiler resisted the idea of Sparks attending because it made him uncomfortable (Pl. Dep. II 55-58, Mot. for Summ. J. Ex. 12; Pl. Dep. III 31-32), Rosner felt that Sparks needed to be there since he was the author of the review and was personally knowledgeable about Bleiler's performance. (Mot. for Summ. J. Ex. 15 at P126.) Bleiler met with Sparks again on February 24 to discuss the duties and responsibilities of his job. (Pl. Dep. III 39.)

In March 2012, Bleiler and three other employees were verbally counseled for failing to notify a Network Analyst of multiple drive failures. (Mot. for Summ. J. Ex. 17; Ex. 8 ¶5 & Sealed Ex. C.)[5] The following month, Bleiler failed to document a flashing red light on a server. (Pl. Dep. III 41-44, 46.)[6] Sparks warned Bleiler that the next flashing red light to go undocumented would result in formal counseling. (*Id.*) Several months after that, Bleiler was verbally counseled for failing to respond to pages and calls while he was on-call.[7] In August 2012, Bleiler received a final written warning as a result of his failure to complete the

---

[5] Doylestown Hospital had a progressive discipline process that included verbal counseling, written counseling, suspension, and discharge. (Opp'n Ex. 2A, ECF No. 22.)

[6] A flashing red light indicates a potential problem with a server. (Pl. Dep. III 44.)

[7] Bleiler's discipline record indicates that on one occasion, Bleiler failed to respond to two pages and a cell phone call one evening that he was on-call, for at least 30 minutes after the first page. (Mot. for Summ. J. Exs. 18 & 19.) On another occasion, the record indicates that he failed to respond to two pages, a cell phone call, and a call to his home phone, for at least 19 minutes after the first page. (*Id.*) In both instances, the manager had to be contacted to address the computer problem. (*Id.*)

department log books (or to notify another employee to do so), for three days.  (Mot. for Summ. J. Ex. 20.)  The discipline record indicates that "completion of the log books and escalation of failure/abnormalities is 60% of the Data Center Analyst function."  (*Id.*)

Bleiler was on-call overnight the evening of February 6, 2013.  He received pages at 5:59 p.m., 6:28 p.m., and 6:47 p.m., to which he responded.  (Mot. for Summ. J. Ex. 24; Opp'n Ex. 1 at 138-39.)  When the switchboard operator paged Bleiler at 7:20 p.m., he did not respond.  At 7:41, she paged him again and got no answer.  At 7:45 and 7:48, she used the alternate form of contact on file, his home phone number, to no avail.  She paged him again, then called him again at 7:56.  She got no response.  When she next tried to contact him, at 8:01, Bleiler's son answered the phone and said his father was not available.[8]  At 8:07, the switchboard operator contacted Hall, who addressed the computer problem.  At 8:37 p.m., Bleiler called the switchboard operator from his cell phone.  She told him that Hall had handled the issue.  (Mot. for Summ. J. Exs. 23-24; Pl. Dep. III 121-128, 134-136.)[9]

At his deposition, Bleiler stated that he had been in the basement working on a project with one of his sons during this time.  (Pl. Dep. III 125-26.)  He said that he did not receive any of the hospital's pages between 7:20 p.m. and 8:30 p.m., and that he did not know the hospital was trying to contact him until he left the basement and encountered his other son upstairs, who said that someone from the hospital had called for him.  (*Id.* at 122-29, 138.)

On February 7, Bleiler met with Rosner, Hall, and Sparks.  They informed him that he was being suspended without pay, pending an investigation into his failure to respond to the

---

[8] Bleiler's son was 11 years old at this time.  (Pl. Dep. III 127.)  Bleiler had not instructed his son to notify him if the hospital called.  (*Id.* at 123.)

[9] Bleiler appears to have responded to two pages following this incident, one around 2:00 a.m. and another around 4:00 a.m.  (Pl. Dep. III 138-39.)

hospital's pages and phone calls between 7:30 and 8:30 the evening before.  (Pl. Dep. III 150, 152; Mot. for Summ. J. Ex. 24.)  Rosner spoke to the switchboard operator who had tried to contact Bleiler, and she detailed her multiple efforts.  (Mot. for Summ. J. Ex. 25.)  Rosner tested Bleiler's pager and confirmed that it was working.  (Rosner Dep. 140-141.)  Rosner had the Hospital's Lead Operator contact Aquis, the communications company that provided the hospital with pagers, and Aquis confirmed that the pages were in fact sent and that there were no problems with the paging system at the time in question.  (*Id.* at 136-37, 140, 143, 147.)  Rosner also inquired as to whether Bleiler may have been working at his second job between 7:30 and 8:30 p.m., and found that he was not.  (*Id.* at 141.)

Hall and Sparks made the decision to terminate Bleiler's employment.  (Rosner Dep. 132; Hall Dep. 52.)  On February 12, 2013, the Hospital terminated Bleiler.  (Pl. Dep. III 163.)  Sparks stated in his deposition that Bleiler was terminated for his failure to respond to pages and for the inconsistent nature of his documentation and HelpStar calls, as reflected in the counseling Bleiler received in 2012.  (Sparks Dep. 134-35.)  Bleiler acknowledges that he was terminated because of his failure to respond to the pages and phone calls made on February 6.  (Opp'n 12.)

Bleiler filed a charge with the Equal Employment Opportunity Commission ("EEOC").  (Compl. Ex. A, ECF No. 1.)  He alleged that the Hospital had retaliated against him because of the sexual harassment complaint he lodged against Hall regarding the April 2011 contact in the data center.  (*Id.* ¶ 4 & Ex. A.)  The EEOC declined to pursue the charge and provided a right-to-sue letter on March 19, 2014.  (*Id.* at Ex. A.)  On April 22, 2014, Bleiler filed a Complaint against Doylestown Hospital, alleging retaliation prohibited by Title VII of the Civil Rights Act and the Pennsylvania Human Relations Act ("PHRA").  (Compl. ¶¶ 73-80.)  On June 5, 2015, the Hospital filed the instant Motion for Summary Judgment.  Bleiler opposed the Motion on

July 3, and the Hospital filed its Reply on July 28.  (Reply, ECF No. 23.)  The Motion is now ripe for disposition.

## II.     LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).

If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.

### III.   DISCUSSION

#### A.   Bleiler Has Not Established a Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, a plaintiff must show:  "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *see also Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).[10]

Bleiler claims that his managers, Hall and Sparks, took adverse employment actions against him as retaliation for the sexual harassment complaint he lodged against Hall in April 2011.  (Compl. ¶¶ 73-80.)  Bleiler has failed to establish a prima facie case of retaliation here because the third prong, a causal connection between the protected activity and the adverse action, is patently absent.  Bleiler has not shown that Hall or Sparks acted adversely on account of his sexual harassment complaint.  Specifically, he has not shown that Hall or Sparks even *knew* about his sexual harassment complaint when they took the adverse actions.

Rosner testified that he did not speak to Hall or Sparks when he conducted his investigation.  (Rosner Dep. 26, 99.)  Both Hall and Sparks testified that they did not know about the sexual harassment charge until Bleiler filed this Complaint.  (Hall Dep. 11; Sparks Dep. 28-29.)  Bleiler offers no evidence to the contrary.[11]   Instead, he asks the Court to disregard the Defendant's evidence because he considers it "implausible" that Rosner would not have spoken to Hall in the course of his investigation.  (Opp'n 27.)  Simply put, Bleiler claims that Rosner

---

[10]   We apply the same standards to retaliation claims under Title VII and the PHRA in this context.  *See Slagle v. Cnty. of Clarion*, 435 F.3d 262, 265 n.5 (3d Cir. 2006).

[11]   Indeed, he seems to concede that Sparks did not know.  In his Opposition, Bleiler admits that "it is feasible" that Sparks did not know about Bleiler's sexual harassment complaint (Opp'n 13), and he focuses his argument on whether Hall knew (*Id.* at 27-28).

8

and Hall are lying and that their testimony is "an obvious fabrication" (*Id.* at 28). However, without evidentiary support, this assertion is nothing more than a theory, and theories are insufficient at the summary judgment level. *See Newman v. Dollar Bank*, No. 04-1163, 2006 WL 895089, at *7 (W.D. Pa. Mar. 31, 2006) ("At the summary judgment stage, theories and bald assertions are insufficient."); *see also Matsushita*, 475 U.S. at 586 (noting that the party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material fact.").[12]

Bleiler's secondary argument is weaker still. He contends that Hall must have known about the complaint since "everyone else in the decision making chain knew." (Opp'n 13, 27-28.)[13] However, baseless speculation will not save a complaint from summary judgment. *See Doe v. Winter*, No. 04-2170, 2007 WL 1074206, at *9 (M.D. Pa. Apr. 5, 2007) ("Although Doe asserts by speculation that the filing of his EEO complaints was 'common knowledge,' the record clearly demonstrates that his supervisors were not aware of Doe's prior EEO activity . . . . Doe's retaliation claim related to his involuntary transfer cannot survive summary judgment."); *Perepchuk v. Friendly's Ice Cream Corp.*, No. 97-1988, 2000 WL 1372876, at *7 (M.D. Pa. Mar. 28, 2000) (granting summary judgment on a retaliation claim because the plaintiff's contention that her supervisor "had to have been aware of her prior discrimination complaint" was insufficient to establish a causal link between the protected activity and the adverse action).

---

[12] We note that Bleiler has submitted exhibits that are meant to denigrate Hall's character. This material is both inappropriate and misplaced. The question here is whether Bleiler was retaliated against for having made a protected complaint, not whether that complaint itself was founded.

[13] Bleiler defines "everyone else in the decision making chain" as Richard Lang, Vice-President of MIS, and Barbara Hebel, Vice-President of Human Resources. (Opp'n 28.)

In short, Bleiler has failed to identify any evidence that Hall and Sparks knew about his sexual harassment claim when they took adverse action against him.  Indeed, the evidence in this record indicates that they did *not* know.  Bleiler has therefore failed to establish the necessary causal link between any adverse action and protected activity.  It is axiomatic that there can be no retaliation without knowledge.  The cases demonstrating this principle are legion.  *See, e.g.*, *Krouse*, 126 F.3d at 505; *Carter v. AT&T Broadband/Comcast*, No. 06-22, 2008 WL 4137972, at *15 (W.D. Pa. Aug. 29, 2008); *Fullman v. Potter*, 480 F. Supp. 2d 782, 791 (E.D. Pa. 2007); *Doe*, 2007 WL 1074206, at *9; *Dollar Bank*, 2006 WL 895089, at *6; *Iyer v. Everson*, 382 F. Supp. 2d 749, 758 (E.D. Pa. 2005); *Perpepchuk*, 2000 WL 1372876, at *7; *Jones v. Sch. Dist. of Phila.*, 19 F. Supp. 2d 414, 421 (E.D. Pa. 1998).  The Defendant is entitled to summary judgment on Bleiler's retaliation claims.

### B. Bleiler Has Not Established that Defendant's Legitimate Reasons for its Adverse Actions Were a Pretext for Unlawful Retaliation

Even had Bleiler established a prima facie case, we would still be required to grant summary judgment to Defendant.  If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to demonstrate a legitimate, non-retaliatory reason for its adverse employment action.  *Krouse*, 126 F.3d at 500; *Fullman*, 480 F. Supp. 2d at 791.  If the employer satisfies this "relatively light" burden, the plaintiff must then "convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Krouse*, 126 F.3d at 500-01.  Here, the Hospital has advanced legitimate, non-retaliatory reasons for its employment actions with respect to Bleiler, and Bleiler has failed to establish that those reasons were pretextual.

Bleiler contends that he was subject to four actions during his employment that could be considered adverse:  the March 2012 verbal counseling; the August 2012 verbal counseling; the

10

August 2012 final warning; and his termination in February 2013.  (Mot. for Summ. J. 45; Opp'n 24-25.)[14]  Each of these actions occurred long after Bleiler lodged his complaint against Hall.  The March 2012 verbal counseling occurred nearly a year after Bleiler lodged his complaint of sexual harassment, and his termination occurred almost two years later.  This is well beyond what could be considered unusually suggestive timing.  *See Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (noting that a gap of two days was unusually suggestive but a gap of two months was not); *Iyer*, 382 F. Supp. 2d at 758 (holding that eight-month gap was not unusually suggestive timing).  Furthermore, although Bleiler takes issue with having been disciplined, he does not actually dispute the legitimate factual bases of either the verbal counselings or the final warning (Pl. Dep. III 56-57, 73-74, 91), and the record demonstrates that others were disciplined for similar infractions.  (Sparks Decl. ¶ 5 & Sealed Ex. C; Sparks Dep. 188-191; Hall Decl. ¶¶ 11-12 & Sealed Exs. J-K.)

Bleiler *does* contest the factual basis of his termination, in that he denies receiving the pages that were sent to him between 7:30 p.m. and 8:30 p.m. on February 6, 2013.  However, he simply has not shown that the Hospital's legitimate reason for terminating his employment was false.  There is no dispute that the Hospital sent the pages to Bleiler's pager.  He argues that the

---

[14]  Bleiler also argues that that the Hospital took adverse action against him by turning a blind eye to the alleged bullying behavior of his co-worker, John Ward.  This argument fails on a number of levels.  First, Bleiler complains that Ward called him "the lowest guy on the totem pole," "a do nothing, no [sic] nothing," and a "deaf, dumb and blind data center operations analyst zombie drone" (Opp'n 7), in emails addressed to Hall and Sparks (and on which he was not included) (*Id.* at Ex. 11).  We are not convinced that this represents anything more than petty unkindness.  More importantly, the Hospital is not liable for Ward's allegedly retaliatory conduct.  "An employer may be liable under Title VII for retaliatory harassment perpetuated by an employee's co-workers only if the prima facie case is satisfied." *Moore v. City of Phila.*, 461 F.3d 331, 349 (3d Cir. 2006).  The prima facie case is not satisfied here, since the record demonstrates that none of these parties — neither Ward, nor Hall, nor Sparks — knew about Bleiler's sexual harassment complaint when Ward made the comments.  (Ward Dep. 35, Mot. for Summ. J. Ex. 10); *see* Part III.A., *supra*.

paging system was unreliable and that it must have malfunctioned with respect to these particular pages. (Opp'n 30-31.)[15] But even if that were true, the fact remains that Bleiler was not available to the Hospital at his *alternate* contact — the phone number he had listed as his back-up in case the paging system failed — for over an hour, during a time when he knew that he was on-call. The fact that he had previously been disciplined for failing to respond to pages and calls only highlights the legitimacy of the termination decision. (Mot. for Summ. J. Exs. 18 & 19.)

The Defendant has more than satisfied its "relatively light burden" of advancing a legitimate, non-retaliatory reason for any adverse employment action it took against Bleiler, and Bleiler has failed to demonstrate that those reasons were false or pretextual. Accordingly, Defendant is entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted. Judgment will be entered in favor of Doylestown Hospital and against Raymond Bleiler on all claims.

An appropriate Order follows.

                                                **BY THE COURT:**

                                                **R. BARCLAY SURRICK, J.**

---

[15] We note that Bleiler did receive the pages sent before 7:30 p.m. and the pages sent after 8:30 p.m.